Slip Op. 19-70

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| TAI-AO ALUMINIUM (TAISHAN) CO., LTD. AND TAAL AMERICA LTD., <br><br> Plaintiffs, <br><br> and <br><br> REGAL IDEAS INC., <br><br> Consolidated Plaintiff, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> THE ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE, <br><br> Defendant-Intervenor. | Before: Gary S. Katzmann, Judge <br> Consol. Court No. 17-00216 |

## OPINION

[Plaintiff's motion for judgment on the agency record is granted in part and denied in part. Commerce's Final Results are remanded consistent with this opinion.]

Dated: June 7, 2019

Jordan C. Kahn, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt, LLP, of New York, NY, argued for plaintiffs. With him on the brief were Ned H. Marshak and Peter W. Klestadt.

Arthur K. Purcell and Kristen Smith, Sandler, Travis & Rosenberg, PA, of Washington, DC, argued for consolidated plaintiff. With them on the brief were David J. Craven and Emi Ito Ortiz.

Amie Lee, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for defendant. With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant

Director. Of counsel was <u>Jessica M. Link</u>, Assistant Chief Counsel, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Robert E. DeFrancesco, III</u>, Wiley Rein LLP, of Washington, DC, argued for defendant-intervenor. With him on the brief was <u>Alan H. Price</u>.

Katzmann, Judge: This case involves issues of scope interpretation and notice in an anticircumvention investigation. Tai-Ao Aluminum Company ("Tai-Ao") and Regal Ideas, Inc. ("Regal") (collectively, "Plaintiffs") are importers of heat-treated 5050-grade aluminum extrusions from the People's Republic of China ("PRC"). The United States Department of Commerce ("Commerce") had issued antidumping and countervailing duty orders on extrusions made from aluminum alloys with the Aluminum Association designations of series 1xxx, 3xxx, and 6xxx. <u>Aluminum Extrusions from the People's Republic of China: Antidumping Order</u>, 76 Fed. Reg. 30,650 (Dep't Commerce May 26, 2011); <u>Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order</u>, 76 Fed. Reg. 30,653 (Dep't Commerce May 26, 2011) (collectively, "the <u>Orders</u>"). The scope of the <u>Orders</u> specifically excludes extrusions made from alloys designated as 5xxx. After the <u>Orders</u>' publication, Commerce determined, pursuant to an anticircumvention inquiry, that imports of 5050-grade extrusions exported by a Chinese company were later-developed merchandise circumventing the <u>Orders</u>. Commerce also ordered Customs and Border Patrol ("CBP") to suspend liquidation on heat-treated 5050-grade extrusions retroactive to the initiation of the anticircumvention inquiry.

Plaintiffs contend that Commerce's determination is unsupported by substantial evidence and contrary to law. They also argue that the anticircumvention inquiry's initiation notice did not provide adequate notice that their products were subject to the inquiry and therefore that liquidation should not have been suspended as of that date. The court sustains Commerce's

anticircumvention determination but concludes that retroactive suspension of liquidation was impermissible under the circumstances here.

## BACKGROUND

### I.    *Legal and Regulatory Framework for Anticircumvention Inquiries.*

Dumping occurs when a foreign company sells a product in the United States for less than fair value – that is, for a lower price than in its home market.  Sioux Honey Ass'n v. Hartford Fire Ins., 672 F.3d 1041, 1046 (Fed. Cir. 2012).   Similarly, a foreign country may provide a countervailable subsidy to a product and thus artificially lower its price.  U.S. Steel Grp. v. United States, 96 F.3d 1352, 1355 n.1 (Fed. Cir. 1996).   To empower Commerce to prevent foreign products from undercutting the domestic market and to offset economic distortions caused by dumping and countervailable subsidies, Congress enacted the Tariff Act of 1930.  Canadian Solar, Inc. v. United States, 918 F.3d 909, 913 (Fed. Cir. 2019); Sioux Honey Ass'n, 672 F.3d at 1046–47.   Under the Tariff Act's framework, Commerce may -- either upon petition by a domestic producer or of its own initiative -- begin an investigation into potential dumping or subsidies and, if appropriate, issue orders imposing duties on the subject merchandise.  Sioux Honey Ass'n, 672 F.3d at 1047.

Anticircumvention inquiries "prevent foreign producers from circumventing existing findings or orders through the sale of later-developed products or of products with minor alterations that contain features or technologies not in use in the class or kind of merchandise imported into the United States at the time of the original investigation."  S. Rep. No. 100–71, at 101 (1987) (quoted in Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998)); see 19 U.S.C. § 1677j.  "Congress has provided that Commerce's consideration of certain types of articles within the scope of an order will be a proper clarification or interpretation of the

order instead of improper expansion or change even where these products do not fall within the order's literal scope." Wheatland Tube, 161 F.3d at 1370.  Of relevance here, Commerce may properly consider "later-developed products that would have been included in the order" had they existed at the time the order was issued. Id. (citing 19 U.S.C. § 1677j(d)).

When determining whether a product is later-developed, Commerce considers whether the merchandise was commercially available at the time the order was issued. See Target Corp. v. United States ("Target III"), 609 F.3d 1352, 1357 (Fed. Cir. 2010).   Commerce defines[1] commercial availability as "products either present in the commercial market or fully developed, i.e., tested and ready for production." Id. at 1358.  When determining whether a later-developed product would have been included in the original order, Commerce must consider whether: (1) the later-developed product "has the same general physical characteristics" as the products "with respect to which the order was originally issued"; (2) the purchasers of the products have the same expectations; (3) the ultimate uses for the products are the same; (4) the same channels of trade are used; and (5) the  products are advertised and displayed in a similar way.  19 U.S.C. § 1677j(d)(1).  If Commerce determines that a later-developed product is circumventing the scope of an order and the product constitutes a "significant technological advancement or significant alteration of an earlier product," it must notify the International Trade Commission ("ITC").  19 U.S.C. § 1677j(e)(1)(C).

When Commerce initiates an anticircumvention inquiry, it must provide notice by publishing the inquiry in the Federal Register. 19 C.F.R. § 351.225(f).  Importers are charged with knowledge of regulations as of the date they are published.  See Target Corp. v. United States

---

[1]  In Target III, the Federal Circuit conducted a Chevron analysis and found the term "later-developed" ambiguous and Commerce's definition reasonable.  609 F.3d at 1359.

("Target II"), 33 CIT 760, 779–80, 626 F. Supp. 2d 1285, 1301 (2009), aff'd, 609 F.3d 1352 (Fed.

Cir. 2010) (citing 44 U.S.C. § 1507; Fed. Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384–85 (1947)).

By regulation, the notice must contain "[a] description of the product that is the subject of the

scope inquiry." 19 C.F.R. § 351.225(f)(1)(i). When Commerce reaches an affirmative preliminary

determination, any suspension of liquidation will continue. 19 C.F.R. § 351.225(l)(2). "[I]f

liquidation has not been suspended[,]" Commerce will instruct CBP "to suspend liquidation . . .

[retroactive to] the date of initiation of the scope inquiry." Id.

## II.    Background of the Aluminum Extrusions Anticircumvention Order.

In 2011, Commerce investigated and then issued antidumping and countervailing duty

orders on aluminum extrusions from the PRC. Orders. The Orders covered aluminum extrusions

made from "alloy series designations published by [t]he Aluminum Association commencing with

1, 3, and 6" but excluded "[a]luminum extrusions made from aluminum alloy with an Aluminum

Association series designation commencing with the number 5." Orders at 30,650–51. The 6xxx

designation covers alloys containing between .1% and 2% magnesium and .1% to 3% silicon. Id.

The 5xxx designation covers alloys containing more than 1% magnesium. Id.

Pursuant to the Orders, Commerce issued a scope ruling on a heat-treated 5050-grade

aluminum extrusion product which found them to be outside the Orders' scope. See Final Scope

Ruling on Aluminum Rails for Showers and Carpets (Dep't Commerce Sept. 6, 2012). Then, in

2016, Commerce initiated an anticircumvention inquiry in response to a request by the Aluminum

Extrusions Fair Trade Committee ("AEFTC") to determine if heat-treated 5050-grade extrusions

were later-developed merchandise circumventing the Orders. Aluminum Extrusions from the

People's Republic of China: Initiation of Anti-Circumvention Inquiry, 81 Fed. Reg. 15,039 (Dep't

Commerce Mar. 21, 2016), AD PD 164 ("Initiation Notice"). The Initiation Notice stated that

"[t]his anti-circumvention inquiry covers extruded aluminum products that meet the chemical specifications for 5050-grade aluminum alloy, which are heat-treated, and exported by Zhongwang" and that Commerce "intends to consider whether the inquiry should apply to all imports of [5050-grade] extruded aluminum . . . regardless of producer, exporter, or importer, from the PRC." Id. at 15,042.  The Initiation Notice also stated that Commerce was conducting the anticircumvention inquiry pursuant to § 1677j(d), later-developed products.  Id.  The AEFTC contended, as summarized by Commerce, Commerce that:

> the scope of the Orders creates an overlap between the chemical composition standards in that there is a narrow window in which a 5xxx series alloy may and does exist that is comprised of more than one percent but less than two percent magnesium by weight, and that in order to use 5xxx-series alloy (i.e., 5050 alloy) in an extrusion application, the metal would have to be heat-treated to achieve the mechanical properties that make 6xxx-series alloy so attractive for extrusion applications.

Initiation Notice at 15,040 (quotation marks omitted).  Additionally, Commerce noted that heat-treatment process was not in use with the 5050-grade alloy at the time of the Orders and that the Aluminum Association guidelines[2] did not recognize this type of treatment at the time of the Orders.  Id. at 15,042–44.  Commerce issued a questionnaire to Zhongwang during the inquiry, but Zhongwang failed to respond.  Aluminum Extrusions From the People's Republic of China: Affirmative Preliminary Determination of Circumvention of the Antidumping and Countervailing Duty Orders and Intent To Rescind Minor Alterations Anti-Circumvention Inquiry, 81 Fed. Reg. 79,444, 79,445 (Dep't Commerce Nov. 14, 2016) ("Preliminary Determination"), AD PD 155, CVD PD 158, and accompanying memorandum ("PDM"), AD PD 86, CVD PD 85.

---

[2]  The Aluminum Association is the authority that maintains the standards for the U.S. aluminum industry with respect to aluminum alloy designations, the chemical composition for the alloys, and the approved tempering methods for the different alloys.  See PDM at 8; Resubmission of Circumvention Inquiry Request at 53–54 (Dec. 30, 2015), AD PD 57–61, AD CD 66–72.

The Preliminary Determination was released on November 14, 2016.   Commerce determined that heat-treated 5050-grade aluminum extrusions were later-developed products circumventing the Orders and suspended liquidation on all heat-treated 5050-grade aluminum extrusions from the PRC, regardless of producer, retroactive to the initiation of the inquiry. Preliminary Determination, 81 Fed. Reg. at 79,445–46.   Commerce based its determination on evidence submitted by the AEFTC and Endura Products, Inc., a domestic producer.   See PDM at 2.   Commerce found that heat-treated 5050-grade extrusions were not commercially available at the time of the Orders.   Id. at 8.   Commerce explained that, while the 5050-grade alloy was commercially available at the time of the initial Orders, it was used in rolling and plate applications and not used to form heat-treated extrusions.   Id. at 8 (citing Resubmission of Circumvention Inquiry Request at 54, Ex. 21, Ex. 27 (Dec. 30, 2015), AD PD 57).   Additionally, an importer of the merchandise stated that the heat-treated 5050-grade extrusions had been developed to meet the requirements of the industry around the imposition of the tariffs.   Id. (citing Resubmission of Circumvention Inquiry Request at Ex. 28).   Evidence also indicated that Columbia Aluminum Products LLC, the largest importer of door thresholds and sills, had substituted heat-treated 5050-grade extrusions in place of in-scope merchandise after the imposition of the Orders.   Id. at 9. Finally, the Aluminum Association did not recognize, at the time of the Orders,[3] the series 5xxx alloys as heat-treatable.

Commerce also examined evidence relating to the statutory criteria[4] and determined heat-treated 5050-grade extrusions were circumventing the Orders.   PDM at 9–12; see 19 U.S.C. §

[3]  The Aluminum Association still does not recognize the series 5 alloys as heat-treatable.  PDM at 8 (citing Resubmission of Circumvention Inquiry at 54, Ex. 21, Ex. 27).

[4]  Plaintiffs do not appear to challenge this aspect of Commerce's PDM or its IDM counterpart. The court therefore does not address Commerce's specific findings regarding these criteria.

1677j(d)(1).  Commerce further determined heat-treated 5050-grade extrusions did not incorporate a significant technological advancement[5] because the merchandise mimicked the physical and chemical properties of 6xxx in-scope merchandise.  Id. at 6.

Additionally, Commerce preliminarily determined that the inquiry should apply to all PRC exporters, PDM at 7–8, because evidence had been submitted "indicating at least 25 other Chinese companies [] are producing and/or exporting inquiry merchandise," id. at 7 (citing Letter from Wiley Rein to U.S. Dep't of Commerce (Oct. 7, 2016), PD 83 CD 82).  Commerce instructed CBP to suspend liquidation of all heat-treated 5050-grade extrusions, regardless of producer, from the PRC from the date of the Initiation Notice, March 21, 2016.  Preliminary Determination, 81 Fed. Reg. at 79,446.

Following the Preliminary Determination, Plaintiffs petitioned Commerce to submit New Factual Information ("NFI") related to the anticircumvention inquiry.  Letter from Sandler, Travis, & Rosenberg to U.S. Dep't of Commerce (Nov. 10, 2016) ("Regal's NFI Request"), AD PD 89, CVD PD 88.  Commerce granted this request and set January 6, 2017 as the deadline for NFI submissions.  Regal made NFI submissions on November 30, 2016 and January 6, 2017.  Letter from Sandler, Travis, & Rosenberg to U.S. Dep't of Commerce (Nov. 30, 2016) ("Regal's November 30, 2016 Submission"), PD 91; Letter from Sandler, Travis, & Rosenberg to U.S. Department of Commerce (Jan. 6, 2017) ("Regal's January 6, 2017 Submission"), PD 98–100.  Commerce then set April 17, 2017 as the deadline to submit briefs and April 24, 2017 as the deadline to submit rebuttal briefs.  U.S. Dep't of Commerce Memorandum to File (Apr. 10, 2017) ("Case Brief Schedule"), AD PD 127, CVD PD 130.  On April 13, 2017, Commerce extended the

---

[5] 19 U.S.C. § 1677j(e)(1)(C) requires that when merchandise "incorporates a significant technological advance" that Commerce notify the ITC before making a determination.

deadlines to submit case briefs and rebuttal briefs to April 24, 2017, and May 1, 2017, respectively. U.S. Dep't of Commerce Memorandum to All Interested Parties (Apr. 13, 2017) ("Case Brief Schedule Extension"), AD PD 131, CVD PD 134.  On April 28, 2017, Regal attempted to submit additional NFI which Commerce rejected as untimely.  Letter from U.S. Dep't of Commerce to Sandler, Travis, & Rosenberg (May 1, 2017) (rejecting Regal's NFI submission), AD PD 141, CVD PD 144.  Commerce issued its Final Determination on July 20, 2017.  Aluminum Extrusions From the People's Republic of China: Affirmative Final Determination of Circumvention of the Antidumping and Countervailing Duty Orders and Rescission of Minor Alterations Anti-Circumvention Inquiry, 82 Fed. Reg. 34,630 (Dep't Commerce July 26, 2017) ("Final Determination"), AD PD 161, CVD PD 166, and accompanying Issues and Decision Memorandum, (Dep't Commerce July 20, 2017) ("IDM"), AD PD 159, CVD PD 162.

Commerce found that heat-treated 5050-grade aluminum extrusions were circumventing the orders and affirmed the Preliminary Determination.  IDM at 1–2.  Commerce determined that past scope inquiries, which had found that heat-treated 5050-grade extrusions were not within the scope of the Orders, did not preclude an anticircumvention inquiry.  Id. at 27.  Commerce found that the products were not commercially available at the time of the initial Orders and therefore were later-developed products.  Id. at 15–24.  Commerce relied on a variety of evidence including the Aluminum Association standards, which do not recognize heat-treatment of the 5050-grade alloy but do refer to the 6xxx series as being heat-treatable.  Id. at 16–17. Plaintiffs provided evidence from a 2002 Australian government specification for signs that required heat-treated 5050-grade aluminum extrusions.  Id. at 14.  However, Commerce credited the expert opinion of Luke Hawkins, who stated this was likely an error.  Id. at 19–20.  Commerce found that Chinese exporters exploited the chemical overlap between the 5050-grade alloy and series 6xxx to create

extrusions that fell outside the scope of the <u>Orders</u> but could be used to replace series 6xxx

products. <u>Id.</u> at 22. Commerce then analyzed whether the heat-treated 5050-grade extrusions met

the five statutory criteria, <u>supra</u> p. 4, used to determine whether a later-developed product falls

within an order's scope, and found that they were met. <u>Id.</u> at 21–24. For these reasons, Commerce

concluded that heat-treated 5050-grade extrusions were later-developed products that were

circumventing the <u>Orders</u>. <u>Id.</u> at 15–24.

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction in this proceeding pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C.

§ 1516a(a)2(B)(vi). The standard of review in this action is set forth in 19 U.S.C. §

1516a(b)(1)(B)(i): "[t]he court shall hold unlawful any determination, finding or conclusion found.

. . to be unsupported by substantial evidence on the record, or otherwise not in accordance with

law."

## DISCUSSION

Plaintiffs contend that Commerce's determination is unsupported by substantial evidence

and contrary to law because 5xxx extrusions were specifically excluded from the scope of the

<u>Orders</u>, record evidence did not show that 5050-grade extrusion products are later-developed

merchandise, and Commerce arbitrarily rejected one of Regal's factual submissions. Plaintiffs

also argue that, because the <u>Initiation Notice</u> did not provide adequate notice that their products

were subject to the inquiry, liquidation should not have been suspended as of the <u>Initiation Notice</u>'s

date. For the reasons stated below, the court sustains Commerce's anticircumvention

determination but concludes that retroactive suspension of liquidation was impermissible under

the circumstances here.

I.    *Commerce Acted Within Its Authority in Conducting the Anticircumvention Inquiry.*

As has been noted, Commerce initiated a later-developed products inquiry to determine whether heat-treated 5050-grade extrusion products were circumventing the <u>Orders</u>.  Plaintiffs argue that Commerce impermissibly conducted a later-developed products anticircumvention inquiry because (1) previous scope rulings related to heat-treated 5050-grade extrusions found them outside the scope and (2) the language of the orders excludes series 5xxx extrusions.  The court is not persuaded.

First, the existence of a previous scope ruling finding a 5050-grade heat-treated extrusion product outside the literal scope of the <u>Orders</u> does not preclude Commerce from undertaking an anticircumvention inquiry.  The purpose of the anticircumvention inquiry is to address efforts by manufacturers to create products that fall outside the literal scope of an order to circumvent the order.  <u>See</u> <u>Wheatland</u>, 161 F.3d at 1370 (citation omitted).  Thus, "[i]n order to effectively combat circumvention of antidumping duty orders, Commerce may determine that certain types of articles are within the scope of a duty order, even when the articles do not fall within the order's literal scope."  <u>Deacero S.A. De C.V. v. United States</u>, 817 F.3d 1332, 1337 (Fed. Cir. 2016) (internal citation omitted).  Thus, as the Federal Circuit held in <u>Target III</u>, Commerce is not precluded from conducting an anticircumvention inquiry "by its earlier conventional scope rulings . . . [because] conventional scope inquiries are different from anticircumvention inquiries."  609 F.3d at 1362 ("Conventional scope inquiries are different from anticircumvention inquiries because they are separate proceedings and address separate issues.").  Moreover, contrary to Plaintiffs' contentions, this interpretation would not permit Commerce to arbitrarily rewrite an order's scope at will.  19 U.S.C. § 1677j provides specific statutory factors, discussed above, that Commerce must consider when making a later-developed product anticircumvention determination.

Plaintiffs argue, citing <u>Wheatland</u>, that Commerce's anticircumvention inquiry was improper because the scope of the <u>Orders</u> explicitly excludes 5xxx extrusions. <u>See</u> 161 F.3d at 1370 ("Commerce was aware of the limitations on its authority to interpret the scope of an order . . . [I]t can neither change them nor interpret them contrary to their terms" (quotations and citations omitted)). However, <u>Wheatland</u> is distinguishable. In that case, Commerce conducted a minor alterations inquiry even though the merchandise was commercially available at the time of the initial investigation, was not examined by the ITC at the petitioner's request, and was intentionally specifically excluded from the scope. <u>Id.</u> at 1367, 1369. In contrast, here, the exclusion does not preclude Commerce from conducting the anticircumvention inquiry because products not in existence at the time that an order's scope is written cannot be intentionally, expressly excluded. <u>See</u> <u>Target III</u>, 609 F.3d at 1363.

The Federal Circuit case <u>Target III</u>, which involved an anticircumvention inquiry into later-developed merchandise outside the literal scope of the relevant order, is analogous. 609 F.3d at 1355. In that case, the products subjected to the ITC injury investigation did not include the products that were the issue of the anticircumvention inquiry. <u>Id.</u> at 1363. Addressing the argument that the scope language indicated the merchandise was "clearly and unambiguously" excluded from the order, the Federal Circuit held that, because the "later-developed merchandise was not present in the market at the time of the [relevant] investigation[,] the [order] could not have addressed" the merchandise. <u>Id.</u> Similarly, in this case, Commerce correctly concluded that the "Orders could not have addressed" heat-treated 5050-grade extrusions because they are later-developed products, <u>infra</u> pp. 13–15, and therefore initiating an anticircumvention inquiry was in accordance with law. <u>See</u> <u>Target III</u>, 609 F.3d at 1363.

II.     *Commerce's Determination That the 5050-Grade Heat-Treated Extrusions Are Later-Developed Products Circumventing the Orders Is Supported by Substantial Evidence and in Accordance with Law.*

Plaintiffs argue Commerce's finding that 5050-grade heat-treated aluminum extrusions are later-developed products is unsupported by substantial evidence and not in accordance with the law.  The court concludes otherwise.

As discussed above, for a product to be later-developed, Commerce applies the "commercial availability" test which examines whether the merchandise was "present in the commercial market or fully developed" at the time of the investigations.  See Target III, 609 F.3d at 1358–59.  The record supports Commerce's conclusion that heat-treated 5050-grade extrusions were not commercially available at the time of the Orders.  The Aluminum Association, whose standards are used to define the exception, see supra note 2, defines 5xxx alloys as non-heat-treatable.  PDM at 8; IDM at 16–18.  Additionally, industry catalogs contained in the record did not offer the 5050-grade alloy as an alternative to the series 6 alloy until after the Orders were issued.  PDM at 9; IDM at 17, 19.  Finally, an importer stated that heat-treated 5050-grade extrusions were developed after the Orders were issued for the purpose of replacing in-scope merchandise. PDM at 9; IDM at 17, 19.

Plaintiffs contend that Commerce ignored other record evidence that contradicted its conclusion.  Specifically, Plaintiffs note: (1) that the 5050-grade alloy was recognized by the Aluminum Association and patented prior to the Orders; (2) that the Australian Government's Standard Specifications for Urban Infrastructure Works ("SSUIW") mentioned heat-treated 5050-grade extrusions as a possible material that could be used for metal signs; and (3) that Tai-Ao was extruding the 5052 alloy by the same process as heat-treated 5050-grade extrusions at the time the Orders were issued.

These arguments are unavailing.  First, as Commerce explained in its <u>IDM</u>, although the

Aluminum Association recognized the use of 5050-grade alloy for rolling and plate applications,

the anticircumvention inquiry specifically involves heat-treated 5050-grade extrusions, which the

Aluminum Association did not recognize.  <u>See</u> <u>IDM</u> at 17–18.  This distinction is significant

because heat-treatment of the 5050-grade alloy changes its physical properties and causes it to

behave more similarly to series 6xxx alloys, which are recognized as heat-treatable and are within

the scope of the <u>Orders</u>.  <u>Id.</u> (citing <u>Resubmission of Circumvention Inquiry</u> at Ex. 28 (explaining

how this effect is achieved)).  Additionally, the scope's exclusionary language is based on the

Aluminum Association's standards.  <u>Orders</u> at 30,651 (excluding "extrusions made from an alloy

with an Aluminum Association series designation commencing with the number 5").

Commerce's determination is also not undermined by either the existence of the Australian

SSUIW or production of 5052 extrusions prior to the <u>Orders</u>.  As has been noted, the affidavit of

Luke Hawkins, the general manager of Australia's largest manufacturer and distributor of

aluminum profiles and a company to which the SSUIW applied, stated the reference to the 5050-

grade alloy in the SSUIW was likely an error.  <u>IDM</u> at 19–20; <u>see also</u> <u>Letter from Wiley Rein to</u>

<u>U.S. Dep't of Commerce</u> at Ex. 5 (Feb 8, 2017), PD 112, CD 85–86 ("Given that there is no

production of 5050 aluminum alloy extrusions in the Australian market so far as I am aware, the

reference to 'Grade 5050 - T5' in the mentioned specifications for road signs appears to be an error

. . . [T]his temper designation is not applicable to [the] non-heat treatable . . . 5050 aluminum

alloy.").  The record contains a letter from an importer of merchandise made from these extrusions

that indicates heat-treated 5050-grade extrusions were developed around the time of the <u>Orders</u>.

<u>See</u> PDM at 8; <u>IDM</u> at 17 (citing <u>Resubmission of Circumvention Inquiry</u> at Ex. 28 ("It was at this

time that the Chinese developed the 5050 alloy that met the requirements of our industry."))

Industry brochures in the record also supported Commerce's determination: prior to the <u>Orders</u>, advertised merchandise was composed of in-scope materials, while after the <u>Orders</u>' imposition, the same products were instead made from heat-treated 5050-grade extrusions.  <u>See</u> PDM at 9; <u>IDM</u> at 17 (citing <u>Letter to the Sec'y from Endura</u>, "Aluminum Extrusions from the People's Republic of China - AntiCircumvention Submission of Endura Products, Inc." (Sept. 28, 2016) at 17, Ex. 5 (brochures showing that the same products were advertised using either in-scope merchandise or 5050-grade heat-treated extrusions)).   Finally, the issue presented here is the commercial availability of 5050-grade heat-treated extrusions, not the 5052-grade alloy or any other 5xxx series extrusions, so the existence of these unrelated products in no way undermines Commerce's determination.  <u>IDM</u> 20–21.  Commerce's determination that heat-treated 5050-grade extrusions were commercially unavailable at the time the <u>Orders</u> were issued is thus supported by substantial evidence.

### III.   *Commerce's Rejection of Regal's Late NFI Was Not an Abuse of Discretion.*

Regal argues that Commerce's decision to reject its NFI filing on April 28, 2017 was an abuse of discretion.  The court is not persuaded.

"Absent constitutional constraints or extremely compelling circumstances[,] the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties."  <u>Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.</u>, 435 U.S. 519, 543 (1978) (quotations and citations omitted).  Commerce may set a deadline for the submission of NFI, 19 C.F.R. § 351.301(a), and Commerce need only consider information submitted before the deadline when making its determination, 19 U.S.C. § 1677m(e).

Here, the NFI was submitted on April 28, 2017, not only after the deadline for the submission of factual information, but also after the deadline for case briefs. U.S. Dep't of Commerce Memorandum to File (Dec. 30, 2016), AD PD 96 (setting the deadline for submission factual information to January 6, 2017); Case Brief Schedule; Case Brief Schedule Extension. Thus, Regal's late submission of NFI would affect the parties' ability to respond to that NFI. Moreover, Commerce had already accepted NFI submissions consisting of several thousand pages on November 30, 2016 and January 6, 2017. Regal's November 30, 2016 Submission; Regal's January 6, 2017 Submission. Commerce's decision to reject the NFI submitted on April 28, 2017 is consistent with the relevant regulations and within its statutory authority. 19 U.S.C. § 1677m(e); 19 C.F.R. § 351.301(a). Finally, Regal has not explained why it was unable to submit the document, which was published in 2004, within the deadlines. Therefore, Commerce did not abuse its discretion when it rejected Regal's untimely NFI submission.

### IV.   Commerce Erred in Retroactively Applying the Duty to the Date of Initiation Rather Than the Date of the Preliminary Determination with Respect to Regal and Tai-Ao.

In the Preliminary Determination, as affirmed in the Final Determination, Commerce directed CBP "to suspend liquidation of inquiry merchandise from the PRC . . . on or after March 21, 2016, the date of publication of the initiation of this inquiry." Preliminary Determination, 81 Fed. Reg. at 79,446; Final Determination, 82 Fed. Reg. at 34,631. Plaintiffs argue that Commerce incorrectly assessed suspension of liquidation from the date of the Initiation Notice because its language did not clearly indicate that the investigation applied to any PRC exporters other than Zhongwang. The court concludes Commerce's decision to suspend liquidation with respect to Plaintiffs from the date of the Initiation Notice was impermissible because Plaintiffs did not receive adequate notice at that time. The Preliminary Determination provided the first notice that

Plaintiffs' products were subject to the inquiry, and therefore liquidation should be assessed as of that date.

Importers are charged with knowledge of the regulations as of the date that they are published.  See Target II, 626 F. Supp. 2d at 1301 (citing 44 U.S.C. § 1507; Fed. Crop Ins., 332 U.S. at 384–85).  When the scope is ambiguous, Commerce cannot suspend liquidation before a formal inquiry is initiated and notice provided.  See Sunpreme Inc. v. United States, __ F.3d __, 2019 WL 2127934, at *11 (Fed. Cir. May 16, 2019) ("Although Commerce . . . can interpret the scope of unclear or ambiguous duty orders, our case law is clear that even Commerce cannot order suspension of liquidation of merchandise covered by such orders before the scope inquiry was initiated."); AMS Assocs. v. United States, 737 F.3d 1338, 1344 (Fed. Cir. 2013) ("Accordingly, when Commerce 'clarifies' the scope of an existing antidumping duty order that has an unclear scope, the suspension of liquidation and imposition of antidumping cash deposits may not be retroactive but can only take effect 'on or after the date of the initiation of the scope inquiry.'" (quoting 19 C.F.R. § 351.225(l)(2))).  When an affirmative preliminary determination is reached in an anticircumvention inquiry and liquidation of the merchandise has not been suspended, it is usually suspended retroactive to the date of the initiation of the inquiry.  19 C.F.R § 351.225(l)(2). The initiation is required to provide "[a] description of the product that is the subject of the scope inquiry."  19 C.F.R § 351.225(f)(1)(i).  Typically, "publication [in the Federal Register] . . . is sufficient to give notice of the contents of the document to a person subject to or affected by it." 44 U.S.C. § 1507.  "What the statutory and regulatory notification provisions require is that any reasonably informed party should be able to determine, from the published notice of initiation read in light of announced Commerce Department policy, whether particular entries in which it has an

interest may be affected by the administrative review."  Transcom, Inc. v. United States

("Transcom I"), 182 F.3d 876, 882–83 (Fed. Cir. 1999).

      In this case, it is undisputed that the products were not clearly included within the scope of

the order.  Thus, Commerce cannot suspend liquidation until the date at which it provided the

parties notice that their products could be subject to the administrative action.  See Sunpreme,

2019 WL 2127934, at *11 ("Commerce can only act prospectively when the scope of an order is

unclear or ambiguous, and thus retroactive authorization of suspension of liquidation is

prohibited." (citation omitted)); AMS Assocs., 737 F.3d at 1344.  The language in the Initiation

Notice here was not sufficient to provide PRC exporters of heat-treated 5050-grade extrusions

other than Zhongwang with "reasonable notice."  See Transcom Inc. v. United States ("Transcom

IV"), 294 F.3d 1371, 1380 (Fed. Cir. 2002).  An initiation notice must "certainly provide[] notice

that the exporters' interests might be affected."  Id. at 1379 (citing Transcom I, 182 F.3d at 884)

(emphasis added).  The Initiation Notice in this case stated that the inquiry would "cover[] extruded

aluminum products that meet the chemical specifications for 5050-grade aluminum alloy, which

are heat-treated, and exported by Zhongwang.  The Department intends to consider whether the

inquiry should apply to all imports of extruded aluminum products . . . regardless of producer,

exporter, or importer, from the PRC."  81 Fed. Reg. at 15,042 (emphasis added).

      The Government asserts that this language was sufficient to provide notice and cites to

Huaiyin Foreign Trade Corp. (30) v. United States, 322 F.3d 1369 (Fed. Cir. 2003), Transcom IV,

and Target II for support.  However, the indication of the possibility of an administrative action

applying is not sufficient unless it states clear and certain circumstances that trigger the action,

Huaiyin, 322 F.3d at 1376–77, which the notice language did not provide.  In addition, Huaiyin,

Transcom IV, and Target II are distinguishable, and the differences between the circumstances in

those cases and the instant case demonstrate why notice here was inadequate.  In Huaiyin, the

initiation notice stated that all exporters would be covered if a certain condition was met, whereas

here Commerce only stated that it "intended to consider" whether to extend the inquiry to products

other than Zhongwang's.  Huaiyin, 322 F.3d at 1376–77 (holding that the following constituted

sufficient notice to all PRC exporters: "[i]f one of the above named companies does not qualify

for a separate rate, all other exporters of freshwater crawfish tail meat from the People's Republic

of China who have not qualified for a separate rate are deemed to be covered").  Similarly, in

Transcom IV, the court held that the language provided sufficient notice because "it was clear that

all exporters of tapered roller bearings from China were subject, in the first instance, to the

administrative review."  294 F.3d at 1379.  Finally, in Target II, plaintiffs argued that their reliance

on previous scope rulings, which had determined their merchandise was not within the scope of

the orders, should rebut the notice provided by the initiation of the anticircumvention inquiry.

Target II, 626 F. Supp. 2d at 1293–94.  The court rejected that argument.  Id.  In that case, unlike

here, there was no assertion that language used in the initiation notice was unclear as to whether

the plaintiff's products were under review.  Id.

      Here, the language "intends to consider whether" does not certainly provide Plaintiffs

notice that they are subject to the inquiry.  Initiation Notice, 81 Fed. Reg. at 15,042.  The Initiation

Notice does not provide any sort of set circumstances under which Commerce would determine

all exporters were subject to the inquiry's findings.  Id.  In fact, the language "intends to consider

whether the inquiry should apply" plainly indicates that Commerce had not yet determined the

inquiry applied to all PRC exporters or the circumstances under which it would.  Id.  In contrast,

the Initiation Notice provides clear notice that the inquiry "covers extruded aluminum products . .

. exported by Zhongwang."  Id.  If Commerce had wanted to conduct an inquiry into all PRC

exporters, it should have stated this fact in similarly clear language.  Additionally, Commerce only sent Zhongwang a questionnaire, which suggests that Commerce only viewed the inquiry as covering Zhongwang at that time.  Therefore, liquidation should have been suspended from the date of the <u>Preliminary Determination</u> when Plaintiffs first received notice that their products were subject to the anticircumvention inquiry.

## CONCLUSION

In conclusion, the court sustains Commerce's determination that it had the authority to conduct a later-developed product anticircumvention inquiry into the heat-treated 5050-grade alloy extrusions.  The court also concludes that Commerce's determination that heat-treated 5050-grade extrusions are later-developed products is supported by substantial evidence and that Commerce did not abuse its discretion by refusing to accept Regal's untimely NFI submission.  However, the court finds that Commerce's decision to suspend liquidation retroactive to the date of the <u>Initiation Notice</u> was not in accordance with law because the language in the <u>Initiation Notice</u> did not provide adequate notice.  The court remands to Commerce to reformulate its liquidation instructions consistent with this opinion and directs that such action be taken within 30 days of the publication of this opinion.

**SO ORDERED.**

*/s/   Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: <u>June 7, 2019        </u>
           New York, New York